|   |   |   |
|---|---|---|
| | UNITED STATES DISTRICT COURT<br>WESTERN DISTRICT OF WASHINGTON<br>AT SEATTLE | |
| KENNETH McGUIRE, On Behalf of Himself<br>and All Others Similarly Situated,<br><br>Plaintiff(s),<br><br>v.<br><br>DENDREON CORPORATION, et al.,<br><br>Defendant(s). | | NO. C07-800MJP<br><br>ORDER ON MOTION TO DISMISS<br>PLAINTIFFS' FIRST AMENDED<br>CLASS ACTION COMPLAINT |

The above-entitled Court, having received and reviewed:

1. Motion to Dismiss Plaintiffs' First Amended Class Action Complaint (Dkt. No. 86)
2. Defendants' Request for Judicial Notice (Dkt. No. 87)
3. Lead Plaintiff's Opposition to Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint (Dkt. No. 91)
4. Lead Plaintiff's Opposition to Defendants' Request for Judicial Notice (Dkt. No. 92)
5. Defendants' Reply in Support of Their Motion to Dismiss Plaintiffs' First Amended Class Action Complaint (Dkt. No. 94)

and all attached exhibits and declarations, makes the following ruling:

IT IS ORDERED that the motion is PARTIALLY GRANTED and PARTIALLY DENIED; the insider trading claim and 10(b)/10b-5 claims against Defendant Gold are DISMISSED; the remainder of the motion is DENIED.

IT IS FURTHER ORDERED that Plaintiffs will be granted leave to amend to correct the deficiencies noted in this Order. The amended complaint must be filed no later than January 5, 2009.

**ORD ON MTN**
**TO DISMISS - 1**

**Background**

Defendant Dendreon Corporation ("Dendreon") is a biotech company focused on development of cancer treatments. FAC ¶¶ 2, 24. Its premier product is "an active cellular immunotherapy for advanced prostrate cancer" called Provenge. FAC ¶¶ 41-42. In November 2006, Dendreon submitted a Biologics License Application ("BLA") concerning Provenge to the Food & Drug Administration ("FDA"), which granted the application "Priority Review status" and a promise of a decision in 6 months' time (by May 15, 2007). FAC ¶ 43.

A critical part of the BLA process is a Chemistry, Manufacturing & Controls ("CMC") inspection, a detailed assessment of the applicant's manufacturing facility. Def. Ex. A at 12-13. At the conclusion of the CMC inspection of Dendreon's facility (in mid-February 2007), the inspectors issued a "Form 483," an "Inspectional Observations Report" which is not issued unless there are "significant objectionable conditions" at a facility. FAC ¶¶ 47, 60. Failure to correct the deficiencies noted in a Form 483 can result in withholding or delaying approval of the BLA. FAC ¶¶ 5, 45, 50.

In the wake of the Form 483, Dendreon did a number of things to which Plaintiffs object, among them issuing a Form 10-K for 2006 and a series of press releases, none of which made mention of the February 2007 inspection of their manufacturing site.[1] FAC ¶¶ 60-70.

On March 29, 2007, Dendreon held a conference call with investors and securities analysts (following an FDA announcement of preliminary advisory committee recommendations that Provenge was both safe and efficacious). During the course of the call, Defendant Gold (President and CEO of Dendreon) mentioned (for the first time, according the amended complaint) that "the FDA came out and we hosted them for preapproval inspections at our Hanover, New Jersey, facility." FAC ¶ 75. An

---

[1] The 2006 Form 10-K and the press releases were the subject of a previous motion to dismiss, which was granted. Order Granting Defendants' Motion to Dismiss the Class Action Complaint, April 18, 2008; Dkt. No. 78. Plaintiffs re-allege those events in their First Amended Complaint; this Order will not re-address those issues, except to note that they remain insufficient for the reasons stated in the previous Order.

**ORD ON MTN TO DISMISS - 2**

analyst then asked: "Okay. Those facilities obviously passed the muster, or can you give us more insight?"

Defendant Urdal (Chief Science Officer) responded to the question: "Actually, those are activities that we'll be discussing with the agency between now and the PDUFA ["Prescription Drug User Fee Act"] date so it's actually, *we hosted a good inspection*, I think, and we have ongoing discussions between now and between [*sic*] May 15, to finish the review of the CMC section." FAC ¶ 77 (emphasis supplied). Again, as with the Form 10-K and the press releases, no mention was made of the Form 483.

During the course of that same conference call, Defendant Gold indicated to the participants: "I think the Company has always taken it very much to heart that we want to keep the investment community up to speed and up to date on the information, so as we learn more from the FDA in our discussions with them, we'll let you know." FAC ¶ 83. Plaintiffs also point to Gold's statements during the conference:

1. "[O]ver the next several weeks we'll be finalizing our discussion with the FDA and we anticipate a decision on Provenge by May 15";
2. "[R]eally over the next several weeks, we're working on completing our discussions with the FDA and anticipate a decision on Provenge by May 15, 2007"; and
3. "I can give you the classic line that the FDA typically follows the advisory committee's recommendation. Obviously we look forward to continuing our discussions and working very closely with the FDA over the next several weeks up to our May 15 PDUFA date." FAC ¶¶ 85-86.

Plaintiffs characterize these statements as "materially misleading when made." FAC ¶ 86. The day after the conference call (March 30, 2007), shares of Dendreon traded heavily and the price of the stock rose as much as 343%. FAC ¶ 12.

Four days later (April 2, 2007), Defendant Gold sold 24% of his stock holdings in the company for a total of approximately $2.7 million. Gold had never sold any of his shares prior to that point. FAC ¶ 13.

**ORD ON MTN**
**TO DISMISS - 3**

On May 8, 2007, the FDA issued a "Complete Response Letter" to Dendreon which rejected their request to approve Provenge and cited two reasons for doing so, one of which was the still-unresolved CMC issues. The other (according to Dendreon's May 9 press release) was the agency's need for "additional clinical data in support of the efficacy claim." FAC, ¶ 94; Def. Ex. G, G-7. In support of their characterization regarding the misleading nature of Defendant Gold's earlier statements, Plaintiffs point to Gold's May 10, 2007 statement (following the issuance of the Complete Response Letter) that "[t]here was very little interaction between the Company and the Agency between the Panel Meeting and when we received the Complete Response Letter." FAC ¶ 87.

Following the issuance of the Complete Response Letter, the value of Dendreon stock went from $17.74 a share at opening to $6.33 by the end of the day. FAC ¶ 95.

Defendants held an investor conference call on May 10, 2007. Defendant Urdal revealed the existence of the Form 483 for the first time. He characterized the issues (still unidentified) in that form as "all observations that were made that we think we have well in hand, that none of the issues are ones that will delay the approval process from a manufacturing point of view." FAC ¶ 96. Plaintiffs characterize this statement as "plainly false: the Provenge BLA could ***not*** be approved until Dendreon had passed a pre-approval inspection. . . [U]nder Section 351 of the Public Health Safety Act, it is against the law the [*sic*] introduce biologics into commerce from an unapproved facility." FAC ¶ 98 (emphasis in original).

## Discussion

**<u>Judicial Notice</u>**

Defendants have requested that the Court take judicial notice of a long list of documents (see Decl. of Greene, Exs. A-Q), all of which the Court finds are either cited by Plaintiffs in the complaint, matters of public record or were publicly available to investors at the time of the alleged violations. Absent evidence of an improper purpose, such documents are properly subject to judicial notice.

Branch v. Tunnell, 14 F.3d 449, 453-454 (9th Cir. 1994); Barron v. Reich, 13 F.3d 1370, 1377 (9th Cir. 1994); Dreiling v. Am. Express Co., 458 F.3d 932, 946, n. 2 (9th Cir. 2006); In re Copper Mountain Sec. Litig., 311 F.Supp. 857, 864 (N.D.Cal. 2004).

Plaintiffs' objections to the motion are exclusively concerned with what they consider to be Defendants' erroneous reading of and interpretation of the meaning of the documents.[2] The Court reiterates its position from the order on Defendants' first motion to dismiss: "The Court takes judicial notice of the requested documents. . . However, the Court will not draw inferences in favor of Defendants from the judicially-noticeable facts." Dkt. No. 78, p. 6.

**Standard of review**

A court considering a motion to dismiss an action brought under § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") accepts all facts in the complaint as true. Tellabs, Inc.. v. Makor Issues & Rights, Ltd., 127 S.Ct. 2499, 2509 (2007). A complaint should not be dismissed if the plaintiffs can prove any set of facts to support a claim that would merit relief. Bell Atl. v. Twombly, 127 S.Ct. 1955, 1065-69 (2007).

Section 10(b) of the Exchange Act states that it is unlawful for any person to "use or employ, in connection with the purchase or sale of any security. . . any manipulative or deceptive device or contrivance[.]" 15 U.S.C. § 78(j)(b). Securities and Exchange Commission ("SEC") Rule 10b-5 imposes liability on any person who "make[s] any untrue statement of a material fact" or "omit[s] to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were, not misleading." 17 C.F.R. § 240.10b-5(b). A claim under Rule 10b-5 must show:

---

[2] "Lead Plaintiff does not object to defendants' request for judicial notice inasmuch as defendants seek to show that certain statements were made to investors at certain times, or that FDA regulations or written policies and procedures exist. . . [but] again objects to defendants' attempts to have the Court take judicial notice of documents to improperly resolve factual issues at this stage of the litigation. Defendants have invoked the vast majority of the exhibits as *proof* that Lead Plaintiff's allegations are 'wrong' or 'faulty.'" (Opp. to Jud. Notice, p. 2; emphasis in original.)

**ORD ON MTN TO DISMISS - 5**

(1) a material misrepresentation or omission; (2) made with a wrongful state of mind (i.e., "scienter"); (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation (i.e., a causal connection between the material misrepresentation/omission and the loss).[3] Dura Pharm, Inc.. v. Broudo, 544 U.S. 336, 341-42 (2005).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes heightened pleading requirements on private actions brought under the Exchange Act. Tellabs, 127 S.Ct. at 2508. If a plaintiff alleges that the defendant made a false or misleading statement, his complaint must "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading;" and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)-(2). A plaintiff who argues that a statement is false or misleading because of an omission must "state with particularity all facts on which [his] belief is based." In re Silicon Graphics, Inc., 183 F.3d 970, 983 (9th Cir. 1999) Finally, a plaintiff must establish "scienter" by stating "with particularity facts giving rise to a strong inference" that defendants acted either with the "intent to deceive or. . . deliberate recklessness." Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 987 (9th Cir. 2008). In order for the inference of fraudulent intent to be strong, it must be "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, *supra* at 2509.

**Plaintiffs' claims: 10(b)/10b-5 violations**

This section of the order will examine separately the adequacy of Plaintiffs' pleadings regarding (1) the "non-scienter" elements of the claims (i.e., whether the regulations were violated) and (2) the existence of scienter (whether Plaintiffs have adequately plead that the defendants possessed the requisite state of mind to establish liability).

---

[3] The Court has previously found the element of "loss causation" to be adequately pled (Dkt. No. 78, pp. 16-17) and declines Defendants' invitation to revisit that issue.

**ORD ON MTN TO DISMISS - 6**

*Violations*

Plaintiffs' FAC differs from its predecessor primarily in its allegations regarding the phone conference held on March 29, 2007 between Defendants Gold and Urdal and a group of investors and analysts. The occasion of the phone conference was the announcement by the FDA's Cellular, Tissue and Gene Therapies Advisory Committee that Provenge had been preliminarily determined to be both safe and efficacious. FAC ¶¶ 71-72.

Defendants Gold and Urdal made a number of statements during the course of this exchange which Plaintiffs consider actionable: Gold's statements regarding "the classic line" that the FDA usually follows the advisory committee's recommendation, his comments that Dendreon was "finalizing" or "completing" discussions with the FDA and his assurances that "we want to keep the investment community up to speed and up to date on the information" (FAC ¶¶ 8, 9); as well as Urdal's statements that "we hosted a good inspection" and that "we have ongoing discussions with [the FDA] between now and between [*sic*] May 15, to finish the review of the CMC section." FAC ¶ 10.

Of the statements made during this phone conference and plead in the FAC, the Court finds only one that is actionable: the "good inspection" statement by Defendant Urdal. The remainder of the pronouncements which Plaintiffs label objectionable suffer from the same defects noted in the previous order – nothing in them states or suggests that Provenge is going to be approved (which would tend to influence the value of the stock), only that a decision is going to be rendered by May 15, 2007. For example, the statement by Defendant Gold, "I can give you the classic line that the FDA typically follows the advisory committee's recommendation," was qualified shortly thereafter by his statement that "[the FDA is] not required to follow the advice of the outside Advisory committee, although as you know, they often do." Def. Ex. F, F-8. There is nothing false or misleading about this statement.

**ORD ON MTN
TO DISMISS - 7**

Gold's comments regarding how "we want to keep the investment community up to speed and up to date on the information, so as we learn more from the FDA in our discussions with them, we'll let you know," when viewed in the context of the conversation that was occurring, are unambiguously an observation concerning Dendreon's willingness to let the investors and analysts know as soon as the FDA had issued a decision on Provenge. Plaintiffs' attempt to stretch the comment to represent some kind of universal, historical promise that the investors would always be told everything about the approval process is simply not supported in the context of the entire phone conference.

However, Plaintiffs' allegations regarding the statement "we hosted a good inspection, I think" are sufficiently well-plead as violations of Rules 10(b) and 10b-5 to survive a motion to dismiss. Defendants are correct that this is a statement of opinion, but incorrect in their legal argument that, in order to be actionable, Plaintiffs must demonstrate that the statement is both "objectively and subjectively false" (In re McKesson HBOC, Inc.. Securities Litigation, 126 F.Supp. 2d 1248, 1265 (N.D. Cal. 2000)); i.e., that not only must the inspection not have been "good," but that Urdal himself did not believe that it had been "good."

The Court does not agree with Defendants' reading of the cases they cite for this proposition; nowhere does McKesson – or the cases it cites as precedent – say that an opinion statement is *only* actionable if subjectively *and* objectively false. Furthermore, Plaintiffs simply have the stronger legal argument with their citation to In re Apple Computer Securities Litigation, 886 F.2d 1109 (9th Cir. 1989):

> [P]rojections and general expressions of optimism may be actionable under federal securities laws. [*citations omitted*] A projection or statement of belief contains at least three implicit factual assertions: (1) that the statement is genuinely believed, (2) that there is a reasonable basis for that belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement. A projection or statement of belief may be actionable to the extent that one of these implied factual assertions is inaccurate. Id. at 1113.

**ORD ON MTN**
**TO DISMISS - 8**

Defendants argue that Apple Computer only applies to future events, but cite no case authority for that argument. Nothing in the language of the opinion supports that narrow interpretation. Analyzing Urdal's statement in accordance with Apple Computer, the Court finds that:

1. There are no allegations that Urdal did not believe the statement.
2. There are insufficient allegations that Urdal did not have a reasonable basis for believing the statement (i.e., Defendants have never disclosed what was in the Form 483; Plaintiffs' allegations regarding how serious the Form 483 deficiencies were are speculation only).
3. Plaintiffs have sufficiently alleged that Urdal was aware of undisclosed facts (the Form 483) tending to seriously undermine the accuracy of that statement. It is not necessary, for the purposes of this analysis, to know the contents of the document, simply the facts that the Form 483 (which by agreement of the parties is only issued for "significant objectionable conditions") existed and that Urdal knew of its existence. It is a reasonable inference to draw that not every investor or analyst participating in that phone conference (and not every "reasonable investor" who would thereafter be apprised of the contents of the discussion), upon being made aware that "significant objectionable conditions" had been discovered, would describe an inspection as "good," regardless of whether the conditions were remediable or the company was undertaking remediation. This prong of the Apple Computer test does not require that the omitted information actually undermine the accuracy of the statement, only that it "tend" to. The Court finds that Urdal's omission meets that test, a finding which draws further strength from the fact that neither Urdal nor Gold ever directly answered the question of whether the facility had "passed muster."

Where the claim of 10(b)/10b-5 violation is based on an omission, that which was omitted must make something which was said materially misleading, creating "an impression of a state of affairs that differs in a material way from the one that actually exists." Brody v. Transitional Hosps. Corp., 280 F.2d 997, 1006 (9th Cir. 2002). It is not significant for purposes of this analysis that the contents of the Form 483 *might* have confirmed Urdal's opinion that it was a "good inspection" (or Plaintiffs' speculation that it was a bad one). Defendants have chosen not to disclose the Form 483 contents, and the Court will not speculate about them. One need not know the contents of an unfavorable report (a fair characterization of the Form 483 under the best of circumstances) to state with a high degree of certainty that the mere fact of its existence would have a negative impact on the hopes and expectations of investors, and thus upon the value of the stock. That is the situation "that actually exist(ed)" on the date that Urdal neglected to inform the participants of the phone conference (and the other members of the investing public) about the existence of the Form 483. His omission of that fact, combined with the failure to answer the question concerning whether the Dendreon manufacturing facility had "passed muster," created "an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." [4] The allegations of that omission are sufficient to find that, for purposes of a motion to dismiss, Plaintiffs have adequately plead a violation of the Exchange Act.

---

[4] The Form 483 has already been found to be "material:" "Although the observations in the Form 483 are not final agency determinations and although Plaintiffs have failed to plead how serious the observations were, the disclosure of 'significant objectionable conditions' would significantly alter the total mix of information available to the reasonable investor because it bears on potential delays in the approval of Dendreon's only near-commercial status product." Dkt. No. 78 at 6-7.

**ORD ON MTN**
**TO DISMISS - 10**

*Scienter*

A plaintiff must establish "scienter" by stating "with particularity facts giving rise to a strong inference" that defendants acted either with the "intent to deceive or. . . deliberate recklessness." Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 987 (9th Cir. 2008). In order for the inference of fraudulent intent to be strong, it must be "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, *supra* at 2509.

Defendants muster an impressive array of arguments and readings of FDA regulations and guidelines in support of their assertion that Plaintiffs' allegations do not adequately plead the existence of the critical element of scienter. They cite to the Court's previous finding that Gold's sale of stock was not sufficiently suspicious to create the inference (Dkt. No. 78 at 14-15), that he only sold 25% of his stock and that Urdal did not sell any of his.

Defendants repeatedly allude to the absence of any evidence regarding the severity of the findings in the Form 483 and again cite the language of the Court's previous order that no inference is possible regarding the severity or lack of severity of the "significant objectionable conditions." Id. at 14. They assert that the existence of the Form 483 conditions would not necessarily block or delay approval of Provenge, and that FDA regulations allow for the post-approval remediation of issues raised during the application process.[5]

Defendants also argue that the consistency with which Urdal and Gold withheld the information concerning (first) the existence of the Form 483 and (later) the nature of the 483 objections is just as likely attributable to their belief (and the reality) that the objections were simply not that serious and their sincere and reasonable belief that the 483 problems could easily be remedied

---

[5] Defendants assert that FDA provisions permitting "application supplements" and "postmarketing commitments" meant that any uncorrected CMC deficiencies would not necessarily prevent approval of their product. Mtn at 12; Reply at 9. These arguments are unconvincing, as the procedures cited appear to apply to products which are already approved. 21 C.F.R. § 601.12. BLA approval requires pre-existing compliance of an applicant's commercial production facilities. 21 C.F.R. § 601.20.

in time to gain approval of their drug. They offer a plausible hypothesis that the reason that the 483 issues were not remediated more quickly was that the FDA requirement (enunciated in the Complete Response Letter) that they conduct further clinical trials meant a delay which would necessitate a reinspection of their facilities in a year or two anyway.

However, in order to carry their burden on scienter, Plaintiffs do not need to invalidate the inferences which Defendants raise. They only need to create an inference of fraudulent intent which is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." They have succeeded in doing this.

The Supreme Court in <u>Tellabs</u> counsels reviewing courts in private PSLRA actions to consider "the totality of the circumstances" when evaluating the adequacy of pleading regarding scienter. The allegations plead by Plaintiffs which, taken in their entirety, create a cogent and compelling inference of the requisite intent are:

- *Defendants' knowledge of the existence of the Form 483* – this Court has already ruled that the mere fact that this document was issued is "material." Dkt. No. 78 at 6-7. The concealment of material information from investors is probative of a "deliberate recklessness."

- *The critical nature of the 483 issues and the likelihood/certainty that, left unresolved, they would have delayed FDA approval* – As previously indicated, the Court does not find Defendants' arguments that the 483 issues would not have held up approval of Provenge to be more compelling evidence of "nonfraudulent intent" than Plaintiffs' evidence to the contrary. Defendants' argument that an "application supplement" process permits post-approval remediation of application issues is contradicted by the language of the FDA regulations indicating that the "application supplement" process permits post-approval modifications only for changes to an already-approved product.

**ORD ON MTN
TO DISMISS - 12**

21 C.F.R. § 601.12. Defendants then suggest that the FDA's "post-marketing commitments" ("PMC") process is commonplace and permits them to essentially promise to fix the 483 problems post-approval, but nothing in the regulations they cite comports with this interpretation – the PMC process appears to be restricted to marketing *studies* concerning "unaddressed safety and efficacy concerns" (<u>not</u> manufacturing facility deficiencies) following approval of a product. Def. Ex. U at 1. And, as Plaintiffs point out in their complaint, Defendants' own Form 10-K reflected the corporation's understanding that facilities issues could indeed thwart approval of a prospective product. FAC ¶ 63 (quoting Defendants' 2006 Form 10-K).

- *Defendants' choice to not disclose the existence of the 483 while characterizing the facility review process as a "good inspection"* – The analysis *supra* concerning the misleading nature of this omission is equally applicable to an assessment of "deliberate recklessness" and gives rise to an inference of reckless, conscious misconduct that is at least as compelling as any inference of nonfraudulent intent.

- *The 483/CMC issues remain unresolved* – More than a year after the issuance of the Complete Response Letter, there is no evidence that any of the concerns (whatever they are) raised in the Form 483 have been addressed. Defendants' argument concerning the "prioritization" of the issues which they must address for approval (first, the additional clinical trials, *then* any facilities' problems) certainly militates in favor an inference of non-seriousness and nonfraudulent intent, but (given that the 483 issues *can* delay approval) there is an equally cogent and compelling inference to be drawn that the issues were serious, numerous and potentially fatal to ultimate approval of Provenge.

**ORD ON MTN**
**TO DISMISS - 13**

Plaintiffs cite the May 10, 2007 conference call (Defendants' refusal to disclose the exact nature of the 483 issues, claiming they were "proprietary" and "not big issues;" and their statement that the 483 items would not delay approval of Provenge) as further evidence of scienter. The Court does not agree. Even assuming that it is permissible to use evidence which arose *later* in time than the class period to draw inferences about Defendants' state of mind *during* the class period, the inferences of recklessly fraudulent conduct which arise from the content of this conference call are simply not as compelling as the inference that Defendants would have us draw of nonfraudulent intent (that the 483 issues were simply not that serious and would be easily resolved prior to approval).

Taken in their entirety, however, Plaintiffs' allegations adequately raise an inference of deliberate recklessness which "reflects some degree of intentional or conscious misconduct." In re Silicon Graphics Inc.. Securities Litigation, 183 F.3d 970, 979 (9th Cir. 1999).

The Court is aware that none of the statements or omissions found sufficient to adequately plead a PSLRA violation were made by Defendant Gold. Defendants have not contested that Gold was aware of the existence of the Form 483 at the time of the March 29, 2007 conference call. Although the Ninth Circuit has not ruled on the issue, there are courts which have held "that a high-ranking company official cannot knowingly fail to correct a false oral statement made by another official at a conference with analysts or similar setting." In re Infosonics Corporation Securities Litigation, 2007 WL 2301757 (S.D. Cal.), citing Barrie v. Intervoice-B Rite, Inc., 409 F.3d 653 (5th Cir. 2005) and In re SmarTalk Teleservices, Inc. Securities Litigation, 124 F.Supp.2d 527, 542 (D.Ohio 2000). The Court finds this reasoning just as applicable to a misleading statement as to a false one, but notes (as the Barrie court did) that Plaintiffs have neglected to plead that Gold failed to correct Urdal's statement. See Barrie, 409 F.3d at 656. Plaintiffs will be permitted to amend their complaint to reflect this allegation should they so choose.

**Plaintiffs' claims: Insider trading**

To establish liability for insider trading under §§ 10(b) and/or 20a, Plaintiffs must demonstrate two elements:

**Sale of stock on the basis of material, nonpublic information**: Plaintiffs have adequately plead this portion of their proof. There is no dispute that the existence of the Form 483 was not public at the time Gold sold his stock, and the Court has already ruled on its materiality.

**Contemporaneous trading with Defendant Gold**: To have standing to pursue an insider trading claim under §§ 10(b) or 20a, Plaintiffs must have traded "contemporaneously" with Gold. Neubronner v. Milken, 6 F.3d 666, 670 and n. 5 (9th Cir. 1993). There is no statutory definition of "contemporaneous" and no court has defined the term with any precision. Gold's stock was sold on April 2, 2007; the subclass period is April 2 - 9 and Lead Plaintiff McGuire's first trade after April 2 was a purchase alleged on April 9 (a lapse of five trading days). Plaintiffs and Defendants agree that contemporaneousness depends on market conditions, and the Court is persuaded by Defendants' argument that the lapse in time is too great.

While recognizing that it is without precedential weight, the Court finds this discussion of the rationale behind the "contemporaneousness" requirement very useful in analyzing the "contemporaneousness" issue:

> The requirement of contemporaneousness developed as a proxy for the traditional requirement of contractual privity between plaintiffs and defendants. [*footnote omitted*] Since identifying the party in actual privity with the insider is virtually impossible in transactions occurring on an anonymous public market, the contemporaneousness standard was developed to give plaintiffs a more feasible avenue by which to sue insiders. William Wang, *The Contemporaneous Traders Who Can Sue an Inside Trader,* 38 Hastings L.Rev. 1175 (1987). The requirement was intended to preserve the notion that only plaintiffs who were harmed by the insider could bring suit, while nonetheless making it possible for such persons to bring suit. While an actual trade between plaintiff and defendant need not be expressly shown, harm to the plaintiff is a necessary factor. Such harm may be found where it appears the plaintiff might, in fact, have traded with the defendant. Buban v. O'Brien, 1994 WL 324093, 3 (N.D.Cal. 1994).

Viewed from the "privity" perspective, Defendants' argument that a high volume of trading and a significant difference in price require a shorter period of time for a finding of contemporaneity is compelling. Between the date of Gold's sale and McGuire's purchase, 178,331,300 shares of Dendreon stock were traded, and the price rose from $14.30/share to $23.58. Def Ex. I. To make a finding of "contemporaneous" transactions under these circumstances would defeat the purpose of the requirement.

Plaintiffs asserted at oral argument that there were members of their class who acquired their Dendreon shares closer in time to Defendant Gold's sale. They will be permitted to amend their complaint to allege class member stock transactions which are contemporaneous with those of Gold.

**Conclusion**

Defendants' motion to dismiss the claims against Defendant Urdal and Dendreon for violations of 10(b) and 10b-5 will be DENIED – Plaintiffs have plead with sufficient specificity facts giving rise to Exchange Act violations and the requisite scienter. The motion to dismiss the claims against Defendant Gold (both for 10(b) and insider trading violations) will be GRANTED, but Plaintiffs will be permitted to amend their complaint to correct the deficiencies regarding those claims noted in this Order. The amended complaint shall be filed no later than January 5, 2009.

The clerk is directed to provide copies of this order to all counsel of record.

Dated: December __6__, 2008

Marsha J. Pechman
U.S. District Judge