# EXHIBIT C

```
                UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF WASHINGTON
                       AT SEATTLE
                      --oOo--
KENNETH MCGUIRE and DAVID           )
WILCZYNSKI, on Behalf of            )
Themselves and All Others           )
Similarly Situated,                 )
                                    )
           Plaintiffs,              )
                                    )
      vs.                           ) No. C07-800 MJP
                                    )
DENDREON CORPORATION, a             )
Delaware Corporation, MITCHELL      )
GOLD, and DAVID URDAL,              )
                                    )
           Defendants.              )
_____)
```

                          DEPOSITION OF
                        DAVID WILCZYNSKI
              _____
                  Tuesday, February 9, 2010

REPORTED BY: SHERRI STARR, CSR# 10245

DAVID WILCZYNSKI        February 9, 2010

2

<pre>
 1                        I N D E X
 2                  INDEX OF EXAMINATIONS
 3                                                      Page
 4    EXAMINATION BY MR. NEFOUSE........................   6
 5
 6
 7            EXHIBITS MARKED FOR IDENTIFICATION
 8    Exhibit No.          Description               Page
 9    Exhibit 27  Dendreon Corporation's Notice of     10
                  Deposition of Plaintiff David
10                Wilczynski
11    Exhibit 28  Plaintiff David Wilczynski's Responses 10
                  to Defendants' First Set of Requests
12                for Production of Documents
13    Exhibit 29  Plaintiff David Wilczynski's Responses 13
                  to Defendants' First Set of
14                Interrogatories
15    Exhibit 30  Document entitled, "Scottrade         44
                  Transactions," Bates DW000001 -
16                DW000004
17    Exhibit 31  Printout of a message board posting    54
                  dated 3/12/2007, Bates DW001467
18
      Exhibit 32  Printout of a message board posting    62
19                dated 3/22/2007, Bates DW001450
20    Exhibit 33  Printout of a message board posting    66
                  dated 3/29/2007, Bates DW001429
21
      Exhibit 34  Dendreon Corp 10-K Annual Report for   73
22                the Fiscal Year Ended 12/31/06, filed
                  on 03/14/2007, no Bates numbers
23
      Exhibit 35  Plaintiffs' Motion for Class           78
24                Certification
25
</pre>

Merrill Legal Solutions
(800) 869-9132

DAVID WILCZYNSKI        February 9, 2010

3

1          EXHIBITS MARKED FOR IDENTIFICATION (CONTINUED)
2     Exhibit No.          Description                    Page
3
4     Exhibit 36  Declaration of Marc M. Seltzer in        82
                  Support of Motion by Kenneth McGuire,
5                 David Harris, Leslie Frederick and
                  David Wilczynski for Consolidation,
6                 Appointment as Lead Plaintiff, and
                  Approval of Movants' Selection of Lead
7                 Counsel, no Bates numbers
8     Exhibit 37  Printout of a message board posting      92
                  dated 5/26/2007, Bates DW001191
9
      Exhibit 38  Document entitled, "David Wilczynski -   96
10                IRA," no Bates numbers (3 pages)
11    Exhibit 39  Printout of records of purchases and     97
                  sales of Dendreon stock in 2007, no
12                Bates numbers (21 pages)
13    Exhibit 40  Complaint for Violation of Federal      100
                  Securities Laws
14
      Exhibit 41  Consolidated Class Action Protective    108
15                Order
16    Exhibit 42  First Amended Complaint for Violation   113
                  of the Federal Securities Laws, no
17                Bates numbers
18    Exhibit 43  Second Amended Complaint for Violation  115
                  of the Federal Securities Laws, no
19                Bates numbers
20    Exhibit 44  Document entitled, "Exhibit 1," no      116
                  Bates numbers
21
      Exhibit 45  Third Amended Complaint for Violation   120
22                of the Federal Securities Laws
23    Exhibit 46  Printout of a message board posting     126
                  dated 4/14/2007, Bates DW001365
24
      Exhibit 47  Printout of a message board posting     127
25                dated 4/16/2007, Bates DW001346

DAVID WILCZYNSKI      February 9, 2010

4

1          EXHIBITS MARKED FOR IDENTIFICATION (CONTINUED)
2     Exhibit No.          Description                    Page
3
4     Exhibit 48  Printout of a message board posting      130
                  dated 3/30/2007, Bates DW001422
5
      Exhibit 49  Printout of a message board posting      133
6                 dated 5/30/2007, Bates DW001174
7     Exhibit 50  Printout of message board posting        135
                  dated 12/25/2007, Bates DW000945
8
      Exhibit 51  Printout of a message board posting      137
9                 dated 2/23/2008, Bates DW000879
10    Exhibit 52  Printout of a message board posting      140
                  dated 8/4/2008, Bates DW000762
11
      Exhibit 53  Printout of a message board posting      143
12                dated 10/9/2008, Bates DW000675
13    Exhibit 54  Printout of a message board posting      144
                  dated 3/8/2009, Bates DW000468
14
      Exhibit 55  Printout of a message board posting      146
15                dated 4/17/2009, Bates DW000322
16    Exhibit 56  Printout of a message board posting      149
                  dated 8/20/2009, Bates DW000060
17
      Exhibit 57  Printout of a message board posting      161
18                dated 7/15/2009, Bates DW000097
19    Exhibit 58  Printout of a message board posting      162
                  dated 7/25/2009, Bates DW000084
20
      Exhibit 59  Printout of a message board posting      164
21                dated 8/29/2009, Bates DW000051
22    Exhibit 60  Printout of a message board posting      174
                  dated 7/9/2009, Bates DW000108
23
24
25

DAVID WILCZYNSKI    February 9, 2010

10

1           marked for identification.)

2           MR. NEFOUSE:  Q.  Mr. Wilczynski, have you

3     seen this document before?

4           A.   No.

5           Q.   You have not seen this document before?

6           A.   No.

7           Q.   Okay.  This is the notice of your deposition.

8     Essentially, what we'll need from you today is -- just

9     to make sure you understand that we need you to --

10    you're going to be testifying here today in your

11    personal capacity regarding your own personal knowledge.

12          A.   I need to restate -- I have seen this.  I

13    received three e-mails from my attorney last week and

14    this was basically background information on where to

15    come and what time, so I have seen it.

16          Q.   Okay.  Well, I just want to make sure you

17    understand that today you're being deposed in your

18    personal capacity and everything regarding your own

19    personal knowledge and not that of anyone else; do you

20    understand that?

21          A.   Yes.

22          Q.   Thank you.

23          MR. NEFOUSE:  Please mark this as Exhibit 28.

24               (Whereupon Exhibit 28 was

25               marked for identification.)

DAVID WILCZYNSKI    February 9, 2010

11

1              MR. NEFOUSE:  Q.  Have you seen this document

2       before, Mr. Wilczynski?

3              A.    Yes.

4              Q.    What is it?

5              A.    Basically, it's the activities surrounding the

6       reason to initiate this lawsuit regarding the actions of

7       the CEO of Dendreon and the chief scientific officer.

8              Q.    Could you please read the caption for me on

9       the front page, it's on the right-hand side in the

10      middle under the word "Class Action."

11             A.    "Plaintiff David Wilczynski's Responses to

12      Defendants' First Set of Requests for Production of

13      Documents."

14             Q.    Did you authorize that your counsel file this

15      document with the court?

16             A.    Yes.

17             MR. KIRKPATRICK:  Objection.

18             MR. NEFOUSE:  Q.  Mr. Wilczynski, these are

19      your responses to document requests that defendants'

20      counsel sent you.  When you received this from your

21      counsel, what did you do?

22             A.    I believe I contacted Ryan and discussed all

23      the --

24             MR. KIRKPATRICK:  You don't have to say what

25      we discussed.

DAVID WILCZYNSKI    February 9, 2010

12

1        MR. NEFOUSE:  Q.  Yeah, please don't.  I don't
2    want to know any specific communications.
3        A.   Yes.
4        Q.   What particular actions did you take after you
5    discussed the matter with your counsel?
6        A.   None.  I don't understand "particular
7    actions."
8        Q.   Did you gather any documents in response to
9    this?
10       A.   Yes.
11       Q.   Okay.  What documents did you gather?
12       A.   History of stock sales and purchases of
13   Dendreon stock.
14       Q.   Could you please go to page 7 of this
15   agreement.  It's kind of tough to see, it's in the
16   bottom left.
17       A.   I found it.
18       Q.   See Document Request Number 2, it says, "All
19   documents (including confirmation slips, brokerage house
20   records, monthly brokerage account statements, and stock
21   certificates) that reflect or identify your sales and/or
22   short sales of Dendreon securities in the last ten
23   years."  Did you provide all those documents to your
24   counselor?
25       A.   Yes.

DAVID WILCZYNSKI    February 9, 2010

20

1    you have now?

2         A.   Yes.

3         Q.   Do you have any older e-mail addresses that

4    you no longer use?

5         A.   My previous company, I have an e-mail address.

6    They're no longer in business, they were sold last year.

7    That e-mail address was davidwilczynski@virologic.com.

8         Q.   Have you ever posted a message or a blog on

9    any kind of Internet message boards before?

10        A.   Yes.

11        Q.   Such as like Yahoo!?

12        A.   Yes.

13        Q.   InvestorVillage?

14        A.   Yes.

15        Q.   InvestorHub?

16        A.   No.

17        Q.   What is your screen name that you use?  Blog

18   name, sorry.

19        A.   Yahoo! is David -- sorry.  Yahoo! is DNCURE

20   and InvestorVillage is PCCURE.

21        Q.   Okay.  And on these blogs on Yahoo! and

22   InvestorVillage, did you ever post about Dendreon?

23        A.   Yes.

24        Q.   Can you briefly describe your education for me

25   starting from high school.

Merrill Legal Solutions
(800) 869-9132

DAVID WILCZYNSKI    February 9, 2010

21

1       A.    I graduated from Central Catholic High School

2    in Toledo, Ohio.    A bachelor of science degree from

3    University of Toledo.    That's it as far as education.

4       Q.    Okay.    What was your bachelor of science in?

5       A.    Biology.

6       Q.    Did you take any classes in finance when you

7    were at the University of Toledo?

8       A.    No, I did not.

9       Q.    Did you take any graduate courses anywhere

10   ever?

11      A.    No.

12      Q.    Any other informal education?

13      A.    No.

14      Q.    Do you hold any professional --

15      A.    I have a two-year associate degree in general

16   studies in addition to the four-year bachelor's.

17      Q.    Where was that from?

18      A.    University of Toledo as well.

19      Q.    Do you hold any professional licenses?

20      A.    No.

21      Q.    And I'm not sure about this but we'll take a

22   look and see here, I know it's going to stretch a while

23   back but I want to know your employment history kind of

24   starting after you graduated college.

25      A.    I worked for Mallinckrodt Pharmaceuticals for

DAVID WILCZYNSKI    February 9, 2010

22

1    about two years, left them to join McNeil

2    Pharmaceuticals which is a division of J&J.  Worked for

3    McNeil for probably about a year and a half then joined

4    DuPont Pharmaceuticals and worked there for 25 years and

5    retired.

6              After I retired from DuPont, I started work

7    with Monogram Biosciences in South San Francisco and

8    worked for them from 2001 through 2007 and retired in

9    2007.

10         Q.    And were you ever fired from any of those

11    positions?

12         A.    No.

13         Q.    And what was your approximate annual revenue

14    in 2007?

15         A.    $150,000 a year.

16         Q.    Have you ever been a manager, director, or

17    officer of a company?

18         A.    I was regional manager with Monogram and

19    Virology.

20         Q.    Was that a public company?

21         A.    Yes.

22         Q.    Has that company ever sued for securities

23    fraud?

24         A.    No.

25         Q.    Would any of those companies be classified as

```
 1              THE WITNESS:  My source of income from
 2    purchasing securities?
 3              MR. NEFOUSE:  Q.  For purchasing, sorry.
 4        A.   They were IRA accounts and regular savings
 5    accounts that I established as a trading account just
 6    from savings and bonuses throughout the years I was
 7    working, made a couple stock trades early on in my
 8    career and did quite well and had that for a while to
 9    continue to invest it.
10        Q.   How long have you been trading in securities?
11        A.   I don't really trade in securities.  I'm not a
12    day trader.  I buy stock and hold it for the long term.
13    I have done one or two day trades in the whole lifetime
14    that I've invested in.
15        Q.   How long have you been buying stock for?
16        A.   I've bought stock since 1973.  '72, '73.
17        Q.   How often do you buy stock?
18        A.   I haven't bought any new stock in the last
19    three years.
20        Q.   How much time do you spend devoting to your
21    investments?
22        A.   Two to three hours a day on the computer.
23        Q.   And before the invention of the wonderful
24    Internet, how did you monitor your stocks?
25        A.   The Wall Street Journal.  The back page that
```

DAVID WILCZYNSKI    February 9, 2010

26

1    has all the listings of the NASDAQ and the Dow.

2        Q.    How much of your income is derived from

3    securities today?

4        A.    100 percent.

5        Q.    And other than Dendreon, what are some of the

6    names of other stocks you've purchased over the years?

7        A.    I currently hold shares in Discovery Labs.  In

8    the past, I have invested in Elan, Gilead, Glaxo,

9    DuPont, Monogram, and Lilly.

10       Q.    When did you purchase shares of Discovery

11   Labs?

12       A.    Approximately two and a half years ago.

13       Q.    So in 2007?

14       A.    Yes.

15       Q.    You still hold Discovery Labs, correct?

16       A.    Yes.

17       Q.    And when did you purchase Elan?

18       A.    I started purchasing Elan around 2005.

19       Q.    And do you still hold Elan stock?

20       A.    No.

21       Q.    When did you sell that?

22       A.    I believe I sold the bulk of my Elan shares at

23   the time I started purchasing Dendreon which is around

24   late 2006.

25       Q.    And do you still hold stock in Gilead?

DAVID WILCZYNSKI    February 9, 2010

30

1          A.    No.

2          Q.    Do you have any informal investment advisors?

3          A.    No.

4          Q.    Do you rely on anyone to make any of your

5     purchases or trades?

6          A.    Not any one person but resources, sources,

7     sure.

8          Q.    Do you regularly discuss your stock purchases

9     with anyone?

10         A.    My wife.

11         Q.    Anyone else?

12         A.    No.

13         Q.    Do you subscribe to any investment

14     publications?

15         A.    No.

16         Q.    Any newsletters?

17         A.    No.

18         Q.    Do you read any financial publications?

19         A.    No.

20         Q.    Do you read the Wall Street Journal still?

21         A.    Not anymore.

22         Q.    Not anymore?

23         A.    No.

24         Q.    Any other investment information on the

25     Internet you read?

DAVID WILCZYNSKI    February 9, 2010

31

1          A.    Stock analyst reports.    I refer to conference
2    calls by respective companies, press releases, message
3    board chatter discussion.    Those are my sources for
4    investing.
5          Q.    How often do you read message boards?
6          A.    Every day.
7          Q.    Do you read them for investing purposes?
8          A.    Not anymore.    Now just to continue to follow
9    developments in the two companies that I own stock in.
10          Q.    When did you read those for investment --
11    sorry, strike that.
12                Have you read message boards before to get
13    financial information?
14          A.    Yes.
15          Q.    When did you do that?
16          A.    At the time I was invested in Elan.
17          Q.    And when was that, 2006?
18          A.    Yes.
19          Q.    Have you done that for any other stocks?
20          A.    Yes.  Yes, Gilead.  Monogram, I worked for
21    them, I was an employee, so it was basically Gilead and
22    Lilly and the other one -- let's see, Gilead and Lilly
23    and Elan.
24          Q.    Did you do that for Dendreon?
25          A.    I never heard of Dendreon until I reviewed

DAVID WILCZYNSKI    February 9, 2010

32

1    discussion around Dendreon on the Elan board.  And at
2    that time, I followed what was happening with Dendreon
3    and looked into it, did the usual due diligence and
4    started investing in Elan and then started participating
5    in and reviewing their message board.
6        Q.   Okay.  All right, we'll get into that later.
7    Do you belong to any investment club or group?
8        A.   No.
9        Q.   Have you attended investment seminars?
10       A.   No.
11       Q.   What are your investment objectives?  And what
12   I mean by that is what do you hope to accomplish by
13   investing in securities?
14       A.   Making as much money as I can.
15       Q.   And have those objectives changed over time?
16       A.   No.
17       Q.   What are your investment strategies?  And what
18   I mean by that is how do you accomplish those
19   objectives?
20       A.   Research, due diligence it's called.
21       Q.   What do you mean by "due diligence"?
22       A.   Reviewing histories of any respective company
23   that I may want to invest in, past histories, prior
24   histories, their markets that they're in, their business
25   model.

DAVID WILCZYNSKI    February 9, 2010

40

1    the time because they're pre-earnings, they didn't have

2    any earnings coming in other than funding for R&D.

3         Q.    Did you read any public filings?

4         A.    Not that I recall.

5         Q.    So nothing filed with the SEC?

6         A.    Not that I recall.

7         Q.    Did you read any other press releases?

8         A.    Yes.

9         Q.    Do you recall which press releases you read?

10        A.    There were numerous press releases as the

11   company was developing Provenge from that time.  I don't

12   recall specifically, you know, which one but it

13   primarily was just monitoring their development of

14   Provenge, getting it through the FDA process.

15        Q.    Did you listen in on any of the conference

16   calls?

17        A.    Yes.

18        Q.    How many?

19        A.    Every time they had one.

20        Q.    This is before you purchased?

21        A.    Oh, no, since I was a shareholder.

22        Q.    Okay.  Any conference calls before you

23   purchased?

24        A.    No.

25        Q.    Did you review any quarterly reports before

DAVID WILCZYNSKI        February 9, 2010

59

1        So I think I posted a comment or a response

2    and then sent a private message, that's what "PM" stands

3    for here to this person because he had accused me of

4    being a short seller and that was a response.  So the

5    reference to this is that I had quite a number of

6    shares, I'm a long-term holder and I'm not a short

7    seller.  That's what this was about.

8        You know, you go back and forth all the time

9    with all kinds of stuff, you're just chatting.  It's a

10   chat line basically.

11       Q.    Right.  So do you dislike short sellers?

12       A.    Yes.

13       Q.    Why do you dislike them?

14       A.    Because of the negative way that they can go

15   about impacting a company's stock.  It's called FUD,

16   fear, uncertainty, and I forget what the D stands for

17   but that's the term, it's called FUD, what the short

18   sellers do to keep the stock price manipulated and down.

19   If you recall, a short seller's main goal is to bet

20   against a company and its stock, that's how they make

21   money.  I'm a long-term holder, I want the company to

22   prosper.

23       Q.    So how do short sellers manipulate stock?

24       A.    Through media outlets, through uncertainty of

25   a company's progress in developing a new technology like

DAVID WILCZYNSKI    February 9, 2010

60

1    Dendreon, providing false analyst reports, i.e., the

2    technology does not work, it will never be approved by

3    the FDA.  Those are examples.

4        Q.    Do you believe short sellers manipulated

5    Dendreon stock?

6        A.    Yes.

7        Q.    How?

8        A.    By the ways I just commented on.

9        Q.    Can you please elaborate?

10       A.    Putting uncertainty out into the investing

11   community that the drug Provenge was not effective;

12   always countering in a negative way medical reports

13   relative to the science of the cassette technology that

14   Dendreon employs; putting out information in data that

15   the markets or the business model has never been tested,

16   it's an immune therapy type vaccine, you've never seen

17   anything like that in the history of cancer treatment;

18   negative, it's not going to work as good as

19   chemotherapy, on and on and on constantly, daily.

20       Q.    When did these short sellers commit these

21   manipulations?

22       A.    Since Day One and they've also manipulated

23   other stocks that I held.

24       Q.    When is Day One as to Dendreon?

25       A.    Since the day I began investing and following

DAVID WILCZYNSKI    February 9, 2010

63

1    document?

2        A.    Yes.

3        Q.    And what is it, please?

4        A.    It's a response to the message board.

5        Q.    Okay.

6        A.    This may have been an initial request that I

7    sent to Ken so I don't recall this being a response, I

8    apologize.

9        Q.    But you wrote this; is that correct?

10       A.    Yes.  Yes.

11       Q.    Who is Rancher?

12       A.    Rancherho is Ken McGuire's screen name.

13       Q.    Do you know Mr. McGuire?

14       A.    No.

15       Q.    Have you communicated with Mr. McGuire outside

16   of this blog?

17       A.    No.

18       Q.    Have you sent him any e-mails, phone calls?

19       A.    I've never talked to him in person.  I don't

20   recall sending any e-mails.  I believe my only

21   interaction with him was via the message board and it

22   was rare that he responded to me.  He didn't know me, he

23   didn't respond.

24       Q.    How did you find out that Rancherho was

25   Kenneth McGuire?

Merrill Legal Solutions
(800) 869-9132

DAVID WILCZYNSKI    February 9, 2010

64

1    A.    I believe I recall reading about his

2    initiation of this lawsuit against Dendreon and may have

3    sent him, via the message board, a post or two relative

4    to contact information.

5    Q.    Contact information in regards --

6    A.    Who the attorney is, who I can talk to to get

7    involved with this case.

8    Q.    And you sent that to him via the message

9    board?

10    A.    I believe I did.

11    Q.    Did you produce that -- did you get that

12    document to your counsel to produce to us today?

13    MR. KIRKPATRICK:  Objection to form.

14    THE WITNESS:  No.

15    MR. NEFOUSE:  Q.  Why not?

16    MR. KIRKPATRICK:  Objection to the form.

17    MR. NEFOUSE:  Q.  You may answer, please.  You

18    can answer.

19    A.    I didn't -- he didn't ask for it.  Every

20    discussion that I have on the message board, there's

21    hundreds of discussions with different message board

22    posters.

23    Q.    Let's go back to the request for production,

24    please.  Let's go to page 8.  This is Exhibit 28, I'm

25    sorry, Document Request Number 4.

DAVID WILCZYNSKI    February 9, 2010

77

1    Advisory Committee meeting, yes, I expected the stock

2    price to go up as it was getting closer because that was

3    a significant date.  That's the last step prior to

4    approval.  So at that time, yes, I expected the stock to

5    go up.

6              And also, after the Advisory Committee

7    especially recommended approval, it's rare -- I can't

8    think of an instance, there may have been one in the

9    history of the FDA that's not approved a drug,

10   particularly in cancer, when the Advisory Committee has

11   overwhelmingly recommended it, especially in the cancer

12   area.  So things looked great.

13       Q.   What was that other company?

14       A.   It may have been ImClone, I-m-C-l-o-n-e,

15   another cancer technology company of which Martha

16   Stewart was an owner, if you recall all that.

17       Q.   And I think we may have -- I'm going to change

18   gears a little bit here.

19            Do you know what a class period is as it

20   relates to a class action?

21       A.   A class period?

22       Q.   Yes, sir.

23       A.   No.

24       Q.   Do you know what a class action is?

25       A.   Yes.

DAVID WILCZYNSKI    February 9, 2010

78

1    Q.    What is a class action?

2    A.    Multiple people, for lack of a better word,

3    band together and try to recover, via a lawsuit, damages

4    that they may have incurred in a particular area, i.e.,

5    investment.

6    Q.    Is the current lawsuit against Dendreon a

7    class action?

8    A.    Yes.

9         MR. NEFOUSE:  Please mark this as Exhibit 35.

10        (Whereupon Exhibit 35 was

11        marked for identification.)

12        MR. NEFOUSE:  Q.  Do you recognize this?

13    A.    Yes.

14    Q.    What is it, Mr. Wilczynski?

15    A.    It's pretty much the specifics regarding the

16   class action versus Dendreon.

17    Q.    What do you mean by "specifics"?

18    A.    Why the litigation has been initiated.

19    Q.    Did you review this document before it was

20   filed?

21    A.    I looked through it.  I didn't memorize it but

22   I looked through it, I scanned it.

23    Q.    Okay.  Would you please turn to page 5, it's

24   at the bottom left.

25    A.    Yes.

DAVID WILCZYNSKI     February 9, 2010

79

1        Q.    If you go to the middle of that page,

2    beginning on lines 13 and 14, do you see your name, sir?

3        A.    Yes, I do.

4        Q.    And at the end of line 14, do you see your

5    name as well?

6        A.    Yes, I do.

7        Q.    Do you notice anything about your name, sir?

8        A.    No.  That's my name.

9        Q.    Is your last name spelled W-i-l-c-z-y-s-n --

10       A.    Oh, it's misspelled, I apologize, yes.  N

11   before the S.

12       Q.    Would you please go to page 20.  Okay, thank

13   you.  If you go to the paragraph under which says

14   "Conclusion," line 16, do you see your name there?

15       A.    Yes, I do.

16       Q.    How many times do you see your name?

17       A.    Twice.

18       Q.    And do you notice anything about your name on

19   the second time it appears in that sentence?

20       A.    Yes, it's misspelled.

21       Q.    So how well would you say you reviewed this

22   document?

23       A.    I probably reviewed it three or four times.  I

24   don't know if that's considered a lot of times,

25   significant time, but probably three to four times I've

DAVID WILCZYNSKI    February 9, 2010

80

1    reviewed it.

2        Q.    And you authorized your counsel to file this

3    on your behalf?

4        A.    Yes.

5        Q.    If you go to back to page 5, please, I'm

6    sorry.

7        A.    Okay.

8        Q.    The first paragraph that's all single-spaced

9    rather than the double-space, do you see that beginning

10   on line 5?

11       A.    Yes.

12       Q.    It says, and I quote, "All persons and

13   entities who purchased the common stock of Dendreon

14   Corporation between March 29, 2007 and May 8, 2007," do

15   you know the significance of March 29, 2007 and May 8,

16   2007?

17       A.    I believe March 29th was the company's

18   conference call after the FDA Advisory Committee had

19   recommended approval.  May 8th, I believe, was the

20   complete response date where the FDA denied approval of

21   Provenge.

22       Q.    Okay, thank you.

23            Do you understand why this document was filed

24   by your attorneys?

25       A.    Yes.

DAVID WILCZYNSKI    February 9, 2010

81

1        Q.    Why was it filed?

2        A.    Because I feel that I was a victim of

3    securities fraud and possibly insider trading.

4        Q.    And that's why this particular document was

5    filed?

6        A.    Yes, for damages, to recover damages.    And

7    also on this particular date, do you want a comment on

8    the March 29th conference call at this point in time?

9        Q.    Sure, please.

10        A.    Which I listened to and I was led to believe

11    that everything was fine on Dendreon's end relative to

12    progressing forward towards FDA approval.    And because

13    of that, I purchased more shares a day or two later, I

14    believe, April 2nd.

15        Q.    Did you purchase shares on March 30th, 2007 as

16    well?

17        A.    I believe I did and there should be a record

18    of that.

19        Q.    And if you could go to the second paragraph

20    that's all single-spaced, what's the significance of

21    April 2nd, 2007?

22        A.    I believe that was the date that I purchased

23    my 5,200 shares of Dendreon stock and I believe that was

24    the date that Dr. Gold sold a significant amount of

25    shares at the same time.

DAVID WILCZYNSKI    February 9, 2010

84

1              What complaint had you reviewed in reference

2    to this certification?

3         A.    I reviewed -- there's only one complaint,

4    isn't there?  I mean, when you say "what complaint,"

5    it's the complaint initiated versus Dendreon relative to

6    securities fraud and insider trading.

7         Q.    Okay.

8         A.    And I'm a class -- subclass representative

9    but --

10        Q.    What's a subclass?

11        A.    Basically, in my understanding, an individual

12   that is available to support Ken as being the lead

13   plaintiff and also the fact that I have some minor

14   experience with manufacturing issues that can delay the

15   approval of drugs, FDA approval, so I have some

16   experience there.  That's why I agreed to be a

17   representative.

18        Q.    And what do you mean by "support Ken"?  Like

19   what would you do to support Mr. McGuire?

20        A.    In any case that he couldn't continue on in

21   representing the class.

22        Q.    So you would take over for Mr. McGuire?

23        A.    If I had to, if I was asked to.

24        Q.    And that's as a subclass representative?

25              MR. KIRKPATRICK:  Object to the form.

DAVID WILCZYNSKI        February 9, 2010

85

1          MR. NEFOUSE:  Q.  Please answer.

2     A.   Yes.

3          MR. KIRKPATRICK:  You can answer the question.

4          THE WITNESS:  Yes.

5          MR. NEFOUSE:  Q.  You mentioned manufacturing

6     approval in the FDA, what experience do you have with

7     that?

8     A.   With Discovery Labs over the last two years

9     and their issues, their problems.  Firsthand experience.

10    Q.   And when you say "firsthand experience," do

11    you mean --

12    A.   With observing the issues that can prevent the

13    approval of a new drug, i.e., around manufacturing,

14    chemistry, CMC, all the issues that go around the

15    required information in addition to the safety and

16    efficacy that's necessary for a drug to be approved.

17    Q.   And I don't want to misquote you or misstate

18    you so please correct me if I'm wrong, so you think

19    supporting Mr. McGuire and also your kind of experience

20    with dealing with manufacturing approval of FDA in

21    relation to stocks is what qualifies you to be the

22    subclass representative?

23    A.   Yes.  When I say experience, I mean having

24    experienced firsthand the delays that can occur when

25    manufacturing issues are in play.

DAVID WILCZYNSKI    February 9, 2010

86

1    Q.    Is there anything else that's personal to you
2    that would qualify you for this position?
3    A.    I suffered damages that I feel were excessive,
4    that's why I'm also involved.
5    Q.    Is that it?
6    A.    And I felt I was misled by, you know, some
7    representatives of Dendreon.    That's basically it.
8    Q.    Thank you.  Did you purchase any of your
9    Dendreon shares on margin?
10    A.    No.
11    Q.    Do you know what margin purchasing is?
12    A.    Borrowing, in my opinion.
13    Q.    Okay.  We're going to jump into a new area.
14    Do you want to keep going, Mr. Wilczynski?
15    A.    Yes.
16    Q.    Okay, we'll keep going then.
17        MR. KIRKPATRICK:  What time is it?
18        MR. NEFOUSE:  It's a little after noon.  Does
19    that work for you?
20        MR. KIRKPATRICK:  Yeah.
21        MR. NEFOUSE:  Q.  Mr. Wilczynski, when did you
22    first consider suing anyone in connection with your
23    purchase of Dendreon securities?
24    A.    Would you please repeat the question?
25    Q.    Sure.  When did you first consider suing

DAVID WILCZYNSKI     February 9, 2010

88

1   months after the conference call where they, Dendreon,

2   addressed the reasons for the complete response letter

3   from the FDA.

4        Q.   Okay.  And what conference call are you

5   referring to?

6        A.   I believe it was in April.

7        Q.   April 2007?

8        A.   I'm sorry, I apologize.  I apologize.  May

9   7th, if I recall correctly, was the complete response

10  notification to the investment community by Dendreon.

11  They followed up the next day or the day after with

12  their conference call and they responded to analysts and

13  investors regarding the path forward.  So that was May,

14  I believe.  May.

15       Q.   So a month or two later?

16       A.   Yes.  Yes, if I recall correctly.

17       Q.   So June/July 2007 ballpark is when you first

18  started considering suing Dendreon for --

19       A.   To the best of my knowledge, it was give or

20  take several months after that conference call.

21       Q.   And what factors led you to sue Dendreon?

22       A.   The fact that I had lost quite a bit of money.

23  I remember waking up May 7th and seeing that I had lost

24  $2 million as a result of all this, and at that time, I

25  thought it was primarily FDA requesting more

DAVID WILCZYNSKI      February 9, 2010

89

1    information, more data, which can sometimes happen, but

2    then with the follow-up conference call, it was finally

3    revealed that there were, in addition, CMC issues, in

4    addition to the safety and efficacy issues, is what

5    prolonged the delay of Provenge at that time.

6        Q.   What do you mean by CMC issues?

7        A.   Manufacturing issues, defects and such.

8        Q.   When was that revealed again, you said --

9        A.   It was revealed finally in the conference call

10   to investors post the complete response notification

11   from the FDA which says they're not going to approve it,

12   they need more information.

13       Q.   And that's when you felt like you found out

14   you were misled; is that correct?

15       A.   That's when it started, yes.  No one was aware

16   in the investment community of anything other than

17   safety and efficacy issues that arose from the complete

18   response.  Everything was considered positive and a go,

19   if you will, as far as approval prior to the complete

20   response letter.

21           Then Dendreon released the complete response

22   letter and then followed up with a conference call and

23   then and only then was the manufacturing defects

24   revealed.  And every savvy investor knows that that's as

25   important to the approval process as safety and efficacy

DAVID WILCZYNSKI   February 9, 2010

91

1      Q.    Did you discuss the possibility of a lawsuit

2   against Dendreon with anyone?

3      A.    No.

4      Q.    When did you decide to join in the lawsuit?

5      A.    When I had discovered that there was one being

6   developed.

7      Q.    This was around June/July 2007?

8      A.    To the best that I can recall, yes.  I don't

9   know the exact date.  It wasn't immediate though, it was

10  several months.  Could have been a little bit longer,

11  maybe six months, I'm just guessing here.

12     Q.    Did anyone contact you regarding the

13  possibility of filing a lawsuit in connection with

14  Dendreon stock?

15     A.    No.

16     Q.    So you found this out on your own?

17     A.    On the message board.

18     Q.    When did you first contact a lawyer regarding

19  the possibility of filing a lawsuit?

20     A.    I don't recall the exact day that I contacted

21  the firm.  I don't recall.

22     Q.    And how did they -- did you contact them or

23  did they contact you?

24     A.    I contacted them and I believe it was probably

25  closer to the end of 2007.  November --

DAVID WILCZYNSKI    February 9, 2010

92

1    October/November.

2         Q.    So you didn't contact them until November

3    2007?

4         A.    I believe it was towards the end of the year.

5         Q.    Okay.

6         A.    But I don't recall the exact month or date.

7         Q.    Could you go back to Exhibit 36, please, the

8    one with the green tag in front of you.

9              As mentioned earlier, at the bottom it

10   indicates that you executed this document on July 23rd,

11   2007; is that correct?

12        A.    That's right, that's what it says here.

13        Q.    So were you not in touch with an attorney

14   regarding this lawsuit at that time?

15        A.    I believe I was.  So that was three months

16   post the conference call in and around -- I mentioned

17   earlier, I didn't know the exact date.  I guess I should

18   have just looked in front of me, but yes, it was at this

19   time.

20              (Whereupon Exhibit 37 was

21              marked for identification.)

22              MR. NEFOUSE:  Q.  Do you recognize this blog,

23   Mr. Wilczynski?

24        A.    Yes.

25        Q.    And did you -- and you wrote this --

DAVID WILCZYNSKI     February 9, 2010

93

1          A.    Yes.

2          Q.    -- message?

3          A.    Sure.

4          Q.    Could you please read the title of the

5    message.

6          A.    This was again a response to someone else's

7    message post.  My comment was, "Outraged is a mild word

8    for what the FDA has done: (Letter sent)."

9          Q.    What had the FDA done at that time?

10         A.    Requested more data to confirm the safety and

11   efficacy of Provenge.

12         Q.    Okay.

13         A.    Our feeling at the time and my feeling was

14   that the data was more than adequate and the Advisory

15   Committee had overwhelmingly recommended for approval

16   and we felt that politics of the FDA had delayed the --

17   you know, delayed the approval of Provenge which they

18   did.

19         Q.    And you spoke a few minutes ago -- and please

20   correct me if I mischaracterize you -- that you found

21   out that there were manufacturing issues in early May of

22   2007, is that correct, after the conference call?

23         A.    Yes, that was the first time that anybody had

24   been made aware of any manufacturing defects.

25         Q.    And despite those manufacturing issues, do you

DAVID WILCZYNSKI    February 9, 2010

94

1    feel that Provenge still should have been approved?

2            MR. KIRKPATRICK:   Objection to form.

3            MR. NEFOUSE:   Q.   You may answer.

4        A.    Do I feel that Provenge should have been

5    approved?  Yes.

6        Q.    Why?

7        A.    Most likely, I base my decision-making process

8    on what the experts, the Advisory Committee meeting, had

9    decided on.

10       Q.    Thank you.  When you first got involved with

11   this lawsuit, what was your -- did you -- strike that.

12           When you first got involved with this lawsuit,

13   did you know it was a class action?

14       A.    Yes.

15       Q.    Has lead counsel represented -- I'm sorry, who

16   is lead counsel in this matter?

17       A.    Ryan is one of several -- Ryan Kirkpatrick is

18   one of several attorneys.

19       Q.    And what's the name of the firm that he works

20   for?

21       A.    Susman Godfrey.

22       Q.    Have they represented you in any other

23   matters?

24       A.    No.

25       Q.    And I think we said this before but besides

DAVID WILCZYNSKI    February 9, 2010

95

1    Susman Godfrey, does anyone else represent you in this

2    suit?

3         A.    I had the attorney for the avocado defense.

4    You said "a suit" --

5         Q.    In this suit.

6         A.    In this particular suit?

7         Q.    Yes.

8         A.    No.

9         Q.    And how did you decide who to sue in this

10   matter?

11        A.    I didn't decide who to sue, the suit had

12   already been initiated.  I joined in as a person who had

13   lost significant amounts of money and was willing to be

14   represented in the lawsuit, the class action lawsuit.

15             MR. NEFOUSE:  All right.  Tell you what, it's

16   about 12:15.  Let's take an hour break for lunch.  So

17   come back here about 1:15.  Off the record.

18             (Lunch recess was taken.)

19             MR. NEFOUSE:  Q.  Mr. Wilczynski, during the

20   break, I believe you and your counselor met and went

21   over some of your stock accounts; is that correct?

22        A.    Yes.

23        Q.    And you forwarded to Dan Turbow and myself

24   certain stock records of purchases and sales; is that

25   correct?

DAVID WILCZYNSKI    February 9, 2010

96

1      A.    Yes.

2      Q.    Okay.  I'm going to go over them right now.

3            MR. NEFOUSE:  Let's mark this as Exhibit 38,

4      please.

5            (Whereupon Exhibit 38 was

6            marked for identification.)

7            MR. NEFOUSE:  Q.  Have you had a chance to

8      review this document, Mr. Wilczynski?

9      A.    Yes.

10     Q.    What is it?

11     A.    It's a history of purchases in 2006 of

12     Dendreon stock in late fall, October/November, and

13     also -- yeah, this is all 2006 purchases of Dendreon

14     stock.

15     Q.    When did you first start purchasing shares of

16     Dendreon stock?

17     A.    October 30th.

18     Q.    And did you get this information from your

19     Scottrade account?

20     A.    Yes.

21     Q.    And you were able to get on this account prior

22     to this deposition today; is that correct?

23     A.    Yes.

24     Q.    Do you know why this was not produced before

25     today?

DAVID WILCZYNSKI    February 9, 2010

100

1           (Whereupon Exhibit 40 was

2       marked for identification.)

3           MR. NEFOUSE:   Q.   Do you recognize this

4    document, Mr. Wilczynski?

5       A.   Yes.

6       Q.   What is it?

7       A.   It's the class action complaint for violation

8    of federal securities laws.

9       Q.   So have you read this document before?

10      A.   Yes, I have read it.

11      Q.   Could you please go to the last page of the

12   document, the bottom right.  Do you see a date on there?

13      A.   Yes, June 6th, 2007.

14      Q.   Is that the date this complaint was filed?

15      A.   Yes.

16      Q.   So previously you just said -- and like I

17   said, please correct me if I'm misstating you, that you

18   were required to turn over stock transactions from when

19   the complaint was filed; is that correct?

20          MR. KIRKPATRICK:   Objection to form.

21          THE WITNESS:   Yes.

22          MR. NEFOUSE:   Q.   Were you required to turn

23   over any stock transaction records of anything before

24   this time period?

25          MR. KIRKPATRICK:   Objection to form.

DAVID WILCZYNSKI    February 9, 2010

101

1          MR. NEFOUSE:  Q.  Please answer the question.

2          MR. KIRKPATRICK:  You can answer the question.

3          THE WITNESS:  Not to my knowledge.

4          MR. NEFOUSE:  Q.  Let's go back and look at

5    Exhibit 28, please.  You've got that in your record,

6    it's the document request.  Can you please review

7    Document Request Numbers 2 and 3 as well as your answer

8    to those?

9        A.  Page 2?

10       Q.  I'm sorry, Document Request Numbers 2 and 3, I

11   believe they start on page 7.

12       A.  Okay.

13       Q.  Will you please review those?

14       A.  A certain paragraph or the whole page?

15       Q.  You can just read them in their entirety,

16   Document Request Number 2 and your response and Document

17   Request Number 3 and your response.

18       A.  To myself or out loud?

19       Q.  To yourself, please.

20       A.  Okay, I've read it.

21       Q.  What is your understanding of this document

22   request, sir?

23       A.  That transactions should have been sent within

24   the period of August 24th, 2006 beginning.

25       Q.  Until?

DAVID WILCZYNSKI    February 9, 2010

102

1    A.    June 6, 2007.

2    Q.    And did you do that, sir?

3    A.    No.

4    Q.    Why not?

5    A.    Just must have missed it.

6    Q.    Okay.  Fair enough.  When did you turn over

7    your documents to your attorneys?

8    A.    I don't recall the exact month or day.  When I

9    was asked to.

10    Q.    Do you remember when that was?

11    A.    No, I don't.

12    Q.    Have you turned over any other documents to

13    your attorneys within the past three or four months

14    related to this document request?

15    A.    No.

16    Q.    And other than your IRA accounts and your

17    Scottrade account, do you have any other accounts where

18    you have Dendreon stock?

19    A.    No.

20    Q.    So just these two accounts?

21    A.    This is it.  Yes, my daughters have two

22    accounts but those are my daughters', not mine, so these

23    are the only two accounts.

24    Q.    To kind of go over again, what efforts did you

25    undertake to provide these documents to your counsel

108

1   blogs that you -- any of the postings you made on the

2   Yahoo! blog prior to this deposition?

3        A.    No.

4        Q.    Why not?

5        A.    I was not asked to do that for Yahoo! and I

6   couldn't if I wanted to.

7        Q.    And why is that, again?

8        A.    I don't know how to do it.  I don't think you

9   can do it on the Yahoo! website.  The IV website is a

10  more professional website where they have access to the

11  messages and such, but I'm not even aware that you can

12  do that with Yahoo!  So there was never any reason for

13  me to go looking back and see what chatter happened, you

14  know, discussing the company and stuff so I wouldn't

15  know how to do it if I could or if it would.

16       Q.    All right.  Thank you, we may come back to

17  that.

18            (Whereupon Exhibit 41 was

19            marked for identification.)

20            MR. NEFOUSE:  Q.  Do you recognize this

21  document, Mr. Wilczynski?

22       A.    Yes.

23       Q.    What is it?

24       A.    I believe it is an order around

25  confidentiality.

DAVID WILCZYNSKI    February 9, 2010

113

```
 1          Q.    What's this complaint about?

 2          A.    Violation of security laws.

 3          Q.    Is this the only complaint in this matter?

 4          A.    Yes, this is the main complaint, to my

 5   understanding.

 6          Q.    And has this complaint been amended?

 7          A.    I don't recall.

 8          Q.    To date, how many complaints have been filed

 9   in this matter?

10          A.    I don't recall.

11          Q.    Can you give me an estimate of how many?

12          A.    I don't recall.

13          Q.    Approximate?  You think one?

14          A.    I don't recall.

15          Q.    Two?

16          A.    I don't recall.

17          Q.    Three?

18          A.    I don't recall.

19          Q.    Four?

20          A.    I don't recall.

21          Q.    Okay, thank you.

22                (Whereupon Exhibit 42 was

23                marked for identification.)

24                MR. NEFOUSE:   Q.   Do you recognize this

25   document, Mr. Wilczynski?
```

DAVID WILCZYNSKI    February 9, 2010

114

1      A.    Yes.

2      Q.    What is it?

3      A.    It's the amended complaint for violation of

4   federal securities laws, first amended complaint.

5      Q.    Did you review it before it was filed?

6      A.    I don't recall.

7      Q.    And do you know how it differs from the

8   previous complaint?

9      A.    Amended means changed, so I'm not sure how it

10  differs.

11     Q.    You don't know how it was changed?

12     A.    I don't recall.

13     Q.    Can you describe the misconduct which was

14  alleged in this complaint?

15     A.    Yes.

16          MR. KIRKPATRICK:  Object to the form.

17          MR. NEFOUSE:  Q.  Can you please describe that

18  for me.

19     A.    That information was withheld by a

20  representative of Dendreon that could have affected my

21  purchasing and/or selling of Dendreon stock.

22     Q.    Did you have any input into drafting this

23  complaint?

24     A.    No.

25     Q.    Did you read the complaint before it was

DAVID WILCZYNSKI    February 9, 2010

115

1    filed?

2        A.    I don't recall.

3              (Whereupon Exhibit 43 was

4              marked for identification.)

5              MR. NEFOUSE:    Q.    Do you recognize this

6    document, Mr. Wilczynski?

7        A.    It's the amended complaint of the original

8    documents.

9        Q.    Do you believe this complaint amended the

10   original complaint?

11       A.    I don't know.

12       Q.    Have you seen this document before today?

13       A.    Yes, I have.

14       Q.    When did you see it?

15       A.    I have seen it in the past three years.  I

16   don't recall when I first reviewed it.

17       Q.    In the past three years, can you narrow that

18   down for me?

19       A.    I don't recall.

20       Q.    Can you give me an estimate?

21       A.    No, I don't recall.

22       Q.    Do you know when it was filed?

23       A.    No, I don't.

24       Q.    Did you review it before it was filed?

25       A.    I don't recall.

119

1          THE WITNESS:  I don't know.

2          MR. NEFOUSE:  Q.  Do you recall reviewing a

3   complaint before you signed the certification?

4          A.   This is the complaint (indicating), correct?

5          Q.   I don't know what --

6          A.   If this is the complaint, yes, I reviewed it.

7          MR. KIRKPATRICK:  He's holding up the second

8   amended complaint.

9          MR. NEFOUSE:  Q.  So you reviewed the second

10  amended complaint before it was filed?

11         A.   I reviewed the complaint.  Amended one, two,

12  and three are similar documents with perhaps changes

13  that I don't recall the specific changes, but I have

14  reviewed the document in general which is the complaint,

15  yes, I have.  Several times.

16         Q.   Sir, do you know the differences between the

17  first amended complaint and the second amended

18  complaint?

19         A.   No, I don't.

20         Q.   Did you ask your attorneys what the

21  differences were between those complaints?

22         MR. KIRKPATRICK:  Don't answer that question.

23  Objection.

24         MR. NEFOUSE:  Strike that.

25         Q.   Can you generally give me a description of the

DAVID WILCZYNSKI    February 9, 2010

120

1    changes between the first amended complaint and the

2    second amended complaint?

3        A.    No.  I don't know.

4              (Whereupon Exhibit 45 was

5              marked for identification.)

6              MR. NEFOUSE:  Q.  Have you seen this document

7    before?

8        A.    No.  This third amended complaint, no.

9        Q.    You've never seen this document before?

10       A.    No.

11       Q.    Did you know that there was a third amended

12   complaint in this action?

13       A.    No.  I don't recall seeing it.  I take that

14   back, I should say no, I don't recall seeing it.

15       Q.    Okay, thank you.  Do you recall seeing any

16   orders on motions to dismiss in this matter?

17       A.    Yes.

18       Q.    What do you recall?

19       A.    Several documents in the past.  I don't recall

20   what month I saw them, but my understanding is when

21   looking back, there was attempts to dismiss but the

22   judge decided it should proceed, to the best of my

23   knowledge.  I did not review any specific documents, I

24   was just aware that there was a motion filed to dismiss.

25       Q.    Thank you.  I'm going to switch gears a little

DAVID WILCZYNSKI    February 9, 2010

141

1   agency in America...FDA.  They are the reason investors

2   lost big time not Dendreon."

3        Q.   Did you believe this statement to be true at

4   the time of this post?

5        A.   Please ask me that again.

6        Q.   Did you believe this statement to be true at

7   the time of this post?

8        A.   No.  No.

9        Q.   Then why did you make it?

10        A.   I don't recall at the time, I'd have to see

11   the thread of the message to be able to respond.  In

12   other words, when there's a thread on a message board

13   there can be 50 responses and you continue to follow up

14   on those responses, and I don't recall this thread, so I

15   don't...

16        Q.   Why would you post this if you didn't believe

17   it to be true?

18        A.   To be active on the message board.

19        Q.   So you would write that "they are the reason

20   investors lost big time not Dendreon" to be active on

21   the message board?

22        A.   I would comment frequently paraphrasing other

23   investors' comments in support.

24        Q.   So you were paraphrasing -- strike that.

25             So what part of this statement did you not

DAVID WILCZYNSKI   February 9, 2010

142

1   believe to be true at the time?

2        A.   "They are the reason investors lost big time

3   not Dendreon."

4        Q.   And why did you not believe that to be true

5   again?

6        A.   I don't remember, I'd have to see the thread

7   of the conversation to be able to comment on why I said

8   that.  I don't recall.

9        Q.   So did you misrepresent yourself on this

10  thread?

11            MR. KIRKPATRICK:  Object to the form.

12            THE WITNESS:  I say a lot of things on this

13  message board that are true; some are not.  It's just my

14  opinion and it's what I feel at the time.

15            MR. NEFOUSE:  Q.  So you lied on this thread?

16            MR. KIRKPATRICK:  Object to the form.

17            THE WITNESS:  No.

18            MR. NEFOUSE:  Q.  Just testified a few seconds

19  ago here that you did not believe this to be true at the

20  time you posted this; is that correct?

21        A.   Correct.

22        Q.   But yet you still posted it?

23        A.   Yes.

24        Q.   So you lied, then, on this message board?

25            MR. KIRKPATRICK:  Objection to form.

DAVID WILCZYNSKI    February 9, 2010

143

1          THE WITNESS:   No, I also posted a comment
2     about Dr. Hussain which I didn't mean.   So no.
3          MR. NEFOUSE:   Q.   Why would you post something
4     you don't mean?
5          A.   Did you ever say anything you don't mean?
6          Q.   I asked you the question, sir.
7          A.   Huh?
8          Q.   I asked you the question, sir.   Please
9     respond.
10          A.   I have no idea.   I don't recall why I said it.
11     I don't recall.
12          Q.   Would you say that this statement is
13     untruthful?
14          MR. KIRKPATRICK:   Objection to the form.
15          THE WITNESS:   Yes.
16          MR. NEFOUSE:   Q.   Why would you make an
17     untruthful statement?
18          MR. KIRKPATRICK:   Objection to the form.
19          THE WITNESS:   Again, as I said earlier, I may
20     have made this comment in support of the thread of the
21     discussion.
22          MR. NEFOUSE:   Q.   Okay.   Thank you.
23          (Whereupon Exhibit 53 was
24          marked for identification.)
25          THE WITNESS:   I recognize this as a --

DAVID WILCZYNSKI      February 9, 2010

148

1    Dendreon security since June 1st, 2007; is that correct?

2        A.    No, I made a mistake.  There has been.

3        Q.    When were those further transactions made?

4        A.    I don't remember the exact dates but when I

5    reviewed my account when we broke -- took a break.  I

6    reviewed the account and I had forgotten but there were

7    sales.

8        Q.    And when were those sales?

9        A.    I don't recall the actual dates.

10       Q.    Do you remember how many shares you sold?

11       A.    No, I don't.  All I know is I purchased

12   Discovery Labs shares with those sold shares.  I don't

13   remember the amount.

14       Q.    Do you remember what year those sales took

15   place?

16       A.    2007, I believe.

17       Q.    Do you know when in 2007?

18       A.    I don't remember the exact date.

19       Q.    After June of 2007?

20       A.    I don't remember.

21       Q.    How many shares of Dendreon stock do you

22   currently own?

23       A.    My daughters each own 8,000 shares.  I

24   currently own 76,400.

25       Q.    That's approximately 92,500 shares.

DAVID WILCZYNSKI    February 9, 2010

150

1          Q.    So you believe that Mitchell Gold, if Provenge

2    got approved, would deserve to be on the cover of Time

3    magazine?

4                  MR. KIRKPATRICK:  Objection to the form.

5                  THE WITNESS:  Yes.

6                  MR. NEFOUSE:  Q.  Why are you bringing a

7    lawsuit against him?

8          A.    The damage has been done.  Money was lost in

9    2007.  This is three years later now, the company has

10   developed the drug to the point of nearing FDA approval

11   and it's a remarkable achievement that they, the science

12   people -- not the management people, the science

13   people -- have conducted a safe and effective Phase 3

14   study, second one, and those results were announced in

15   Impact last year.

16         Q.    Despite all that, you think he would deserve

17   to be on Time magazine?

18                 MR. KIRKPATRICK:  Objection to the form.

19                 MR. NEFOUSE:  Q.  You can answer.

20         A.    As being a part of a new paradigm shift in

21   cancer treatment, yes.

22         Q.    We're going to shift gears a little bit here.

23   Going back to the lawsuit, are you requesting a trial by

24   jury in this matter?

25         A.    Yes.

DAVID WILCZYNSKI    February 9, 2010

151

1          Q.    Okay.  How do you know that?

2          A.    I don't.  If there's no settlement prior, then

3    my understanding is it goes to jury and I support that.

4          Q.    Can you describe for me the remedies that

5    you're seeking in this matter?

6          A.    Damages regarding the losses that I incurred

7    with my Dendreon investment.

8          Q.    What damages have you suffered?

9          MR. KIRKPATRICK:  Objection to the form.

10         MR. NEFOUSE:  Q.  You can answer.

11         A.    If I would have been notified or made aware of

12   the fact of the manufacturing complaints by the FDA, I

13   would have sold my Dendreon stock at that time.  Because

14   I knew in advance or know in advance that if the

15   manufacturing defects are part of the FDA approval

16   process and there are defects there, the drug will not

17   be approved, and consequently, the stock price would

18   have tanked big time.

19         Q.    Okay.  Are you seeking a particular amount in

20   damages personally?

21         MR. KIRKPATRICK:  Object to the form.

22         THE WITNESS:  Not a specific number, no.

23         MR. NEFOUSE:  Q.  Have you performed a damages

24   analysis?

25         A.    No, I haven't.

DAVID WILCZYNSKI    February 9, 2010

154

1          Q.    Where did you see those?

2          A.    In one of the documents that I reviewed.  I

3     don't recall specifically which one but I have seen some

4     costs relative to some clerical issues and such.

5          Q.    When you say "reviewed," when did you review

6     this document?

7          A.    Actually, I think just about a week ago.

8          Q.    What is your understanding of your financial

9     obligations if you're certified as a class

10    representative?

11         A.    Please ask me that again.

12         Q.    What is your understanding of your financial

13    obligations if you're certified as a class

14    representative?

15         A.    I don't understand by "financial obligations,"

16    what you mean by that.

17         Q.    In other words, would you have to pay anything

18    one way or the other?

19         A.    It's a contingency basis complaint is my

20    understanding and I would not be liable for any costs

21    one way or the other.

22         Q.    Is it your understanding that you have a

23    fiduciary obligation to members of the class if you were

24    to be appointed as class representative?

25         A.    Yes.

Merrill Legal Solutions
(800) 869-9132

DAVID WILCZYNSKI    February 9, 2010

155

1        Q.    What does that mean to you?
2        A.    To represent the class to the best of my
3    ability in the most truthful way, my interpretation.
4        Q.    What do you think your duties would be if you
5    are certified as a class representative?
6            MR. KIRKPATRICK:  Objection to the form.
7            THE WITNESS:  Being deposed today, and if it
8    goes to court, giving testimony in a trial supporting
9    the claim.
10            MR. NEFOUSE:  Q.  Does that differ from your
11    current duties to the class?
12        A.    No.
13        Q.    What is your understanding of your duties with
14    respect to any settlement of this lawsuit?
15        A.    Please ask me that again.
16        Q.    Sure.  What is your understanding of your
17    duties with respect to any settlement of this lawsuit?
18        A.    I don't see any duties of any kind that I'm
19    responsible for as a result of this litigation as far as
20    distribution of any damages, that's not my role.
21        Q.    So you would have no duties with respect to
22    any settlement in this lawsuit?
23            MR. KIRKPATRICK:  Object to the form, vague
24    and ambiguous.
25            THE WITNESS:  I'm not sure I understand what

DAVID WILCZYNSKI    February 9, 2010

158

1          MR. NEFOUSE:  I'm not asking him to tell me
2      what his communications are.
3          MR. KIRKPATRICK:  It's obvious.
4          MR. NEFOUSE:  No, I'm not.  I'm just asking to
5      see how he's updated on the lawsuit.
6      Q.  Do you receive e-mail from your attorneys?
7      A.  We discuss -- I get calls.  Short calls
8      sometimes, as I said, sometimes longer.
9      Q.  And how often were these calls?
10         MR. KIRKPATRICK:  Objection to form.
11         THE WITNESS:  At least every two months.
12         MR. NEFOUSE:  Q.  Anyone other than
13     Mr. Kirkpatrick, have you spoken to anyone else at
14     Susman Godfrey about this lawsuit?
15     A.  No.
16     Q.  Since you've been involved with the
17     litigation, how much time do you think you've spent on
18     the litigation?
19     A.  Regarding conversations with my attorney?
20     Q.  Everything.
21         MR. KIRKPATRICK:  Objection to the form.
22         THE WITNESS:  Maybe 12 hours.
23         MR. NEFOUSE:  Q.  So since June 2007, you've
24     spent about 12 hours on this litigation?
25         MR. KIRKPATRICK:  Objection to form.

DAVID WILCZYNSKI   February 9, 2010

159

1          THE WITNESS:   I don't have an exact number.

2     I'll say 12 to 15 hours.   I didn't keep track.

3          MR. NEFOUSE:   Q.   Have you supervised the

4     conduct of the litigation?

5          A.   No.

6          Q.   Do you plan to supervise the conduct of the

7     litigation in the future?

8          A.   I'm not sure what you mean by "supervise the

9     conduct."

10         Q.   As a class representative, would you have

11    any more say in the litigation?

12         A.   Not that I'm aware of.

13         Q.   How much time are you willing to spend

14    supervising this lawsuit?

15         A.   As much as is required.

16         Q.   How do you distinguish between your role in

17    this litigation and lead counsel's role, your attorney's

18    role in this litigation?

19         MR. KIRKPATRICK:   Objection to the form.

20         THE WITNESS:   I view myself as a

21    representative of the class who suffered damages.

22         MR. NEFOUSE:   Q.   And how is that different

23    from your attorney's role in this litigation?

24         MR. KIRKPATRICK:   Object to the form.

25         THE WITNESS:   I suffered damages; my attorney

1    data.

2          Q.    And when was this?

3          A.    I don't recall the date.  It was -- I believe

4    it was the morning of, I don't recall, prior to

5    Dr. Gold's formal presentation relative to the final

6    outcome of the third Phase 3 trial for Provenge.

7          Q.    And what year is this in?

8          A.    2009.

9          Q.    Okay.  And why did you write this post?

10          A.    It was just my comment, my 2 cents on the

11    actions of what occurred prior to a positive

12    announcement.

13          Q.    And what did you mean by "rigged like Vegas"?

14          A.    A casino.  Wall Street is a casino in my

15    opinion.

16          Q.    How so?

17          A.    It's manipulated.  The market makers who

18    direct the action of the stock manipulate the trading

19    and the selling illegally.  Naked short-selling is just

20    one example, day in/day out in my opinion.

21          Q.    Okay.  Thank you.

22          Mr. Wilczynski, I just want to clear up the

23    record on some things that we discussed earlier today,

24    and so if you wouldn't mind, could you go back to

25    Exhibit Number 28 which were your requests for

DAVID WILCZYNSKI    February 9, 2010

168

1        A.   It appears I refused certain documents.  I

2    objected to document requests.

3        Q.   Beginning in October 2009, what did you do to

4    search for documents responsive to these document

5    requests?

6        A.   I don't remember.

7        Q.   How much time did you spend searching for

8    documents responsive to these document requests?

9        A.   I do not remember.

10       Q.   Did you review this document before it was

11   filed and served back to opposing counsel?

12            MR. KIRKPATRICK:  Object to the form.

13            THE WITNESS:  I believe I did.  I don't

14   remember the specifics, though, of this particular

15   document.

16            MR. NEFOUSE:  Q.  Do you know if you provided

17   any documents responsive to these requests?

18            MR. KIRKPATRICK:  Objection to the form.

19            THE WITNESS:  No.

20            MR. NEFOUSE:  Q.  You don't know if you have?

21            MR. KIRKPATRICK:  We've gone over this like

22   eight times.

23            THE WITNESS:  I don't remember.

24            MR. KIRKPATRICK:  And you haven't established

25   there's a single document he hasn't turned over that he

DAVID WILCZYNSKI    February 9, 2010

169

1    has.  He said there are no hard copy files, he said

2    there are no e-mails.

3        MR. NEFOUSE:  Is there an objection here?

4        MR. KIRKPATRICK:  Yes.

5        MR. NEFOUSE:  Then state your objection and

6    that's it.

7        MR. KIRKPATRICK:  No, I'm going to stop the

8    entire deposition if we go over this eight more times.

9        MR. NEFOUSE:  I'm trying to clear the record.

10        MR. KIRKPATRICK:  It's been clear forever.

11   You wanted him to produce the postings and we say no.

12   That's the record.

13        MR. NEFOUSE:  Q.  Did you spend any time

14   searching for any documents in the past four to five

15   months?

16        A.  No, that I can remember.

17        Q.  Thank you.

18        All right, let's go back to Exhibit Number 29,

19   please, which were your responses to interrogatories.

20        A.  Okay.

21        Q.  Did you draft any portions of this document,

22   Mr. Wilczynski?

23        A.  No.

24        Q.  Did you review this document before it was

25   served on defendants' counsel?

DAVID WILCZYNSKI    February 9, 2010

171

1    Dendreon securities, Wilczynski relied upon the

2    integrity of the market for Dendreon securities.  In

3    addition, Wilczynski considered:  (a) Dendreon's SEC

4    filings and annual reports to shareholders."

5              Did you or did you not rely on SEC filings in

6    transacting in Dendreon securities?

7              MR. KIRKPATRICK:  Object to the form.

8              THE WITNESS:  I did -- I do recall seeing some

9    SEC filings regarding the stock options and such.  If

10   that was considered part of my investment decision

11   making, it was not.  Annual reports to shareholders,

12   it's pretty much general information I was very aware

13   of.

14             MR. NEFOUSE:  Q.  What SEC filings?

15             MR. KIRKPATRICK:  He already testified press

16   releases are all SEC filings.

17             THE WITNESS:  SEC filings are not only press

18   releases but, you know, stock options, who's awarded

19   what, any fundraising activities that Dendreon may have

20   generated to continue the development of Provenge.

21   That's usually an SEC filing, I believe.

22             MR. NEFOUSE:  Q.  You believe?

23        A.   Yeah, I'm not really up to speed that much on

24   SEC filings, I really don't pay much attention to them.

25        Q.   So did you or did you not review SEC filings

DAVID WILCZYNSKI    February 9, 2010

172

1    before you transacted in --

2        A.    I did not review.  I have read or perused SEC

3    reports but never used them as part of a consideration

4    of investment decision-making.

5            In other words, I'm aware of when a stock

6    option was given and such and that's about the extent of

7    it.

8        Q.    Okay.  Also in this response you say that in

9    transacting Dendreon securities you relied upon the

10   integrity of the market.  What did you mean by that?

11       A.    That was probably a reference to the market

12   that Dendreon was developing their drug in which was the

13   cancer treatment market.  And integrity, maybe that was

14   a bad word, the integrity.  It was just -- I followed

15   the markets and the opportunities for new business

16   development in certain markets and this one is cancer.

17   So my emphasis was around that particular market.  And

18   when I say integrity, it was probably long-term

19   opportunities.  Integrity, I'm not sure what that -- why

20   I applied that particular word there.

21       Q.    Did you draft this response to this

22   interrogatory?

23       A.    I commented on this and suggested and such.

24   May have been a poor choice of word at the time,

25   integrity.  I used it but I'm not the most eloquent

**CERTIFICATE OF REPORTER**

1

2

3          I, SHERRI STARR, a Certified Shorthand

4   Reporter, hereby certify that the witness in the

5   foregoing deposition was by me duly sworn to tell the

6   truth, the whole truth, and nothing but the truth in the

7   within-entitled cause;

8          That said deposition was taken in shorthand by

9   me, a disinterested person, at the time and place

10  therein stated, and that the testimony of the said

11  witness was thereafter reduced to typewriting, by

12  computer, under my direction and supervision;

13         That before completion of the deposition,

14  review of the transcript [ ] was [X] was not requested.

15  If requested, any changes made by the deponent (and

16  provided to the reporter) during the period allowed are

17  appended hereto.

18         I further certify that I am not of counsel or

19  attorney for either or any of the parties to the said

20  deposition, nor in any way interested in the event of

21  this cause, and that I am not related to any of the

22  parties thereto.

23      Dated: February 11th, 2010.

24

25      SHERRI STARR, CSR No. 10245